IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

_____

| | |
|---|---|
| JASON FARMER, ) | |
| Derivatively on Behalf of Nominal ) | |
| Defendant DGSE COMPANIES, INC., ) | |
| ) | No. |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | JURY |
| ) | |
| WILLIAM H. OYSTER, JAMES D. ) | |
| CLEM,WILLIAM CORDEIRO, CRAIG ) | |
| ALAN-LEE, DAVID RECTOR, ) | |
| L.S. SM ITH, and JOHN BENSON ) | |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| DGSE COMPANIES, INC., ) | |
| ) | |
| Nominal Defendant. ) | |

_____

**SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff, Jason Farmer ("Plaintiff"), by and through his undersigned attorneys, brings this verified shareholder derivative complaint (the "Complaint") against the defendants named herein, for the benefit of nominal defendant, DGSE Companies, Inc. ("DGSE" or the "Company"), against certain current and/or former members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' dissemination of materially false and misleading proxy statements, breaches of fiduciary duties, and abuse of control.

**NATURE AND SUMMARY OF THE ACTION**

1.      DGSE is a purveyor of wholesale and retail jewelry headquartered in Dallas,

Texas.  The Individual Defendants (defined herein) are current and former members of DGSE's board, and its former Chief Financial Officer ("CFO").

2.      On April 16, 2012, DGSE shocked the markets when it disclosed that each and every one of its financial statements, for all years and quarters, from the second quarter of 2007 through the third quarter of 2011, as well as any press releases or earnings announcements related thereto, could not be relied on and would need to be restated.  The Company disclosed that the restatements were required due to improper accounting for inventory and other balance sheet accounts perpetrated by the Company's former Chief Financial Officer, defendant Benson (defined herein).

3.      At present, the Company has not clarified exactly which financial metrics will need to be restated or the impact of the restatement on the Company's bottom line.  While there is no guarantee that the problems are not more extensive than currently disclosed, the stunning breadth of the restatement, impacting *thirteen* quarterly reports, *four* annual reports, and dozens of press releases and earnings announcements, is sufficiently profound that the Company's shareholders and the markets really have no idea what the true financial condition of the DGSE is.

4.      The Company's definitive proxy statements for the years 2008, 2009, 2010, and 2011 (collectively, the "Proxies"), all expressly included DGSE's most recent annual report on Form 10-K, all of which the Company has now admitted conveyed a false and misleading picture of the Company's finances.  The Proxies solicited shareholder votes on director nominees, ratification of the Company's selection of its outside accountant, and other business.  In light of the restatement, it is now clear that these votes were fraudulently solicited and based on false and misleading statements contained within the Proxies.

5.     Although the restatement alone inflicted severe harm on the Company and its shareholders, DGSE's problems continued to fester.  On April 17, 2012, the New York Stock Exchange ("NYSE") froze trading of the Company's stock.  The damage to DGSE and its shareholders is plainly evident.  DGSE stock remains frozen at present, five full months after the revelations of wrongdoing.  In June 2012, the Company announced that it was being investigated by the Securities and Exchange Commission ("SEC") in connection with the accounting irregularities, and in September 2012, a securities class action was filed against the Company.

6.     As a result of the trading halt, DGSE's stock has been rendered effectively illiquid and valueless.  Even if the Company's stock was trading, DGSE management has lost all credibility, which loss would certainly be reflected in the share price of DGSE stock.  Further, the Company is facing liability on the order of tens, if not hundreds, of millions of dollars due to the SEC investigation and the securities class action.

7.     The dissemination of the false and misleading Proxies, as well as the other harms to the Company could all have been substantially minimized or avoided entirely had the director defendants properly discharged their fiduciary duties by exercising sufficient oversight over the Company's controls for accounting and financial disclosure.

8.     Defendants Oyster, Cordeiro, Alan-Lee, and Rector, have all been DGSE directors for the entire period impacted by the restatement and constitute four of the five current directors of the Company.  Smith, who retired in November 2011, served as Chairman and Chief Executive Officer ("CEO") of DGSE for the entire period impacted by the restatement.  Since 2009, these current and former directors ignored a veritable torrent of red flags alerting them to wide-ranging accounting and financial control deficiencies, and to defendant Benson's improper conduct.

9.      In October 2009, after being prompted by the SEC, the Company disclosed that it had identified five material weaknesses in its controls over financial reporting affecting its financial statements for 2008.   Certain of these material weaknesses implicated conduct by Benson.  In early 2010, the Company was forced to amend its Form 10-K for the 2008 fiscal year *three* times, and various Forms 10-Q *twice* each.

10.      In March 2011, the Company disclosed that it would be unable to timely file its annual report for the 2010 fiscal year.  When it finally did file the annual report for 2010, the Company disclosed that that as of December 31, 2010, it continued to have deficient controls that constituted material weaknesses in *the exact same areas implicated in the April 16, 2012 disclosure of the massive restatement*, specifically, accounting for inventory.  In the same annual report, the Company disclosed that it would need to restate its quarterly reports for the second and third quarters of 2010.

11.      However, the Company's internal controls over accounting and financial reporting were so entirely deficient, that even in disclosing the material weaknesses and restatements in the 2010 annual report, DGSE had failed to follow SEC rules in reporting same. Thus, the Company was subsequently be required to make additional SEC filings related to the restatement in order to comply with SEC reporting rules.

12.      In February 2012, the Company filed a current report on Form 8-K blaming the 2010 restatement on "a new accounting system" but claiming that investors could rely on the Company's quarterly reports for the second and third quarters of 2011.  When the large restatement was disclosed in April 2012, those very same quarterly reports for the second and third quarters of 2011 were included in the restatement.  Thus, there is reason to doubt that the Company's current disclosure regarding the extent of the April 2012 restatement is accurate.

13.     The former and current director defendants simply could not have been unaware of the pervasive and systematic failure of DGSE's accounting controls beginning in at least 2009.  The same problems that ultimately caused the April 2012 disclosure of restatement were evident throughout 2009, 2010, and 2011.  However, in complete dereliction of their fiduciary duties, the director defendants failed to sufficiently monitor the deficient controls, institute functioning controls, or communicate the existence of the deficiencies with due candor.

14.     The price that the Company and its shareholders have already paid due to this utter failure of directorial oversight is severe.  However, it pales in comparison to the liability the Company continues to face due to the SEC prove, securities class actions, and eventual unfreezing of the Company's stock.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because a substantial portion of the transactions and wrongs complained of herein, including defendants' participation in the wrongful acts detailed herein, occurred in this District and DGSE maintains its corporate headquarters in this District.  Further, defendants either reside in or maintain executive offices in this District, and/or have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

## THE PARTIES

**A. Plaintiff**

17.     Plaintiff is, and was at all times relevant hereto, an owner and holder of DGSE common stock.

**B. Defendants**

18.     Nominal defendant DGSE is a corporation incorporated under the laws of the State of Nevada, which maintains its principal executive offices at 11311 Reeder Road, Dallas, Texas.  According to its public filings, DGSE buys and sells jewelry, bullion products and rare coins to wholesale and retail customers.

19.     William H. Oyster ("Oyster") has served as the Company's CEO and Chairman of the Board since November 1, 2011.  Prior to November 1, 2011, Oyster served as a director and the Company's President since 1990.

20.     James D. Clem ("Clem") has served as a director, the Company's Chief Operating Officer, and DGSE's Secretary since December 20, 2011.  Prior to December 20, 2011, Clem served as the Company's Vice President of Sales and Marketing since January 2008.

21.     William P. Cordeiro ("Cordeiro") has served as a director of DGSE since June 1999.  Cordeiro is a member of the Audit Committee and served in that capacity at all times relevant to the allegations detailed herein.

22.     Craig Alan-Lee[1] ("Alan-Lee") has served as a director of DGSE since 2004. Alan-Lee is a member of the Audit Committee and served in that capacity at all times relevant to the allegations detailed herein.

23.     David Rector ("Rector") has served as a director of DGSE since 2007.

24.     L.S. Smith ("Smith") served as the Company's CEO and Chairman of the Board from 1980 until November 1, 2011.

---

[1]     Alan-Lee is also referred to in certain Company documents as "Allan-Lee".

25.     John Benson ("Benson") served the Company's Chief Financial Officer until November 17, 2011 when he retired.  After his retirement, Benson continued to hold the position of Senior Consultant to the Interim Chief Financial Officer of DGSE until March 31, 2012.

26.     The defendants referenced in ¶¶ 19-25 shall be collectively referred to herein as the "Individual Defendants."

## DEFENDANTS' DUTIES

27.     By reason of their positions as officers, directors, and/or fiduciaries of DGSE and because of their ability to control the business and corporate affairs of DGSE, defendants owed DGSE and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage DGSE in a fair, just, honest, and equitable manner.  defendants were and are required to act in furtherance of the best interests of DGSE and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to DGSE and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

28.     Defendants, because of their positions of control and authority as directors and/or officers of DGSE, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial, and directorial positions with DGSE, each of the defendants had knowledge of material non-public information regarding the Company.

29.     To discharge their duties, the officers and directors of DGSE were required to

exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of DGSE were required to, among other things:

   a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

   b. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

   c. Exercise good faith to ensure that the Company's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); and

   d. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence;

30.    According to the Charter of the DGSE Audit Committee, defendants Cordeiro and Alan-Lee, in their capacity as sole members of the Audit Committee, were and are responsible for, among other things:

   a. Overseeing the Company's financial reporting process;

   b. Setting the "overall corporate 'tone' for quality financial reporting, sound business risk practices, and ethical behavior"; and

   c. Reviewing interim and annual financial statements with management prior to filing.

## SUBSTANTIVE ALLEGATIONS

31.    On July 12, 2007, DGSE filed its definitive proxy statement on form DEF 14A with the SEC in anticipation of the annual meeting of shareholders to be held on July 27, 2007. According to the proxy statement, the Company's board of directors was composed of the following Individual Defendants: Smith, Oyster, Cordeiro, Alan-Lee, and Rector, as well as

Richard M. Gozia ("Goiza") and Mitchell T. Stoltz ("Stoltz").  At the time, the Company was listed on the NASDAQ exchange.  The proxy statement disclosed that DGSE was a controlled company within the meaning of the NASDAQ listing standards: defendant Smith was beneficial owner of 69.2% of the Company's common stock.  Additionally, defendant Alan-Lee had granted defendant Smith a proxy to vote Alan-Lee's 320,000 shares, which represented 6.61% of the Company's outstanding common stock.  The proxy statement disclosed the existence of the following Corporate Governance Agreement:

> In connection with our acquisition of Superior Galleries, Inc. (Superior), in May 2007, we entered into a corporate governance agreement (the corporate governance agreement) with Stanford International Bank Ltd. (Stanford), our largest stockholder and a lender to Superior, and Dr. Smith, our second-largest stockholder, chairman and chief executive officer. Pursuant to the corporate governance agreement, subject to the applicable fiduciary duties of our board of directors and compliance with applicable law, we have agreed to recommend up to six nominees to constitute our board of directors.
>
> Each of Dr. Smith and Mr. Oyster has the right to be nominated for election to our board as long as he serves as an executive officer of our company. In addition, Dr. Smith has the right to nominate two "independent directors" (as defined in the corporate governance agreement) for election to our board as long as he beneficially owns at least 10% of our outstanding shares of common stock. Dr. Smith has exercised this right to nominate Dr. Cordeiro and Mr. Alan-Lee for election to our board. Stanford has the right to nominate two "independent directors" (as defined in the corporate governance agreement) for election to our board as long as it beneficially owns at least 15% of our outstanding shares of common stock. Stanford has exercised this right to nominate Messrs. Stoltz and Gozia for election to our board.

July 12, 2007 Form DEF 14A at 4.  Defendants Cordeiro and Alan-Lee were the sole members of the Audit Committee.

32.     On August 14, 2007, the Company filed its quarterly report for the second quarter of 2007 on Form 10-Q with the SEC.  Among other things the Form 10-Q was signed by defendants Smith, Oyster, and Benson, and accompanied by certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") separately executed by defendants Smith and Benson.

Among other things, the Form 10-Q disclosed:

**Item 1A. Risk Factors.**

\* \* \*

*Fluctuations in our inventory turnover and sales*.

We regularly experience fluctuations in our inventory balances, inventory turnover and sales margins, yields on loan portfolios and pawn redemption rates. Changes in any of these factors could materially and adversely affect our profitability and ability to achieve our planned results.

\* \* \*

*We are subject to new corporate governance and internal control reporting requirements, and our costs related to compliance with, or our failure to comply with existing and future requirements could adversely affect our business.*

We face new corporate governance requirements under the Sarbanes-Oxley Act of 2002, as well as new rules and regulations subsequently adopted by the SEC, the Public Company Accounting Oversight Board and the Nasdaq Capital Market. These laws, rules and regulations continue to evolve and may become increasingly stringent in the future. In particular, we will be required to include management's report on internal controls as part of our annual report for the year ending December 31, 2007 pursuant to Section 404 of the Sarbanes-Oxley Act. We are in the process of evaluating our control structure to help ensure that we will be able to comply with Section 404 of the Sarbanes-Oxley Act. We cannot assure you that we will be able to fully comply with these laws, rules and regulations that address corporate governance, internal control reporting and similar matters. Failure to comply with these laws, rules and regulations could materially adversely affect our reputation, financial condition and the value and liquidity of our securities.

August 14, 2007 Form 10-Q at 17.

33.     As a result of the foregoing, as August 14, 2007, defendants Oyster, Cordeiro, Alan-Lee, Rector, and Smith were on actual notice that the Company was subject to certain corporate governance and internal control reporting requirements, and that failure to comply with these requirements would seriously harm the Company.  Defendants were likewise on notice that inventory levels and accounting therefore materially affected the Company's bottom line.

34.     On November 14, 2007, the Company filed its quarterly report for the third quarter of 2007 on Form 10-Q with the SEC.  Among other things the Form 10-Q was signed by defendants Smith, Oyster, and Benson and accompanied by certifications pursuant to SOX separately executed by defendants Smith and Benson.  The 10-Q included risk factor disclosures substantially similar to those excerpted above.

35.     On March 31, 2008, the Company filed its annual report for 2007 on Form 10-K with the SEC.  Among other things the Form 10-K was signed by defendants Smith, Oyster, Benson, Cordeiro, Alan-Lee, and Rector, as well as Stoltz and Gozia, and accompanied by certifications pursuant to SOX separately executed by defendants Smith and Benson.  The 10-K included risk factor disclosures substantially similar to those excerpted above.

36.     On May 13, 2008, the Company filed its quarterly report for the first quarter of 2008 on Form 10-Q with the SEC.  Among other things the Form 10-Q was signed by defendants Smith, Oyster, and Benson and accompanied by certifications pursuant to SOX separately executed by defendants Smith and Benson.  Additionally, the Form 10-Q disclosed:

**Item 4. Controls and Procedures**.

*Evaluation of disclosure controls and procedures*. An evaluation was performed under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) as of the end of the period covered by this quarterly report. Our disclosure controls and procedures are designed to ensure that information required to be disclosed by us in the reports we file or submit under the Securities Exchange Act of 1934, as amended, is (1) recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and (2) accumulated and communicated to our management, including our Chief Executive Officer, to allow timely decisions regarding required disclosure. ***Based on that evaluation, our management, including our Chief Executive Officer and our Chief Financial Officer, concluded that our disclosure controls and procedures were effective***.

*Changes in internal controls.* For the quarter ended March 31, 2008, there have been no changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934) that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

May 13, 2008 10-Q at 13 (Emphasis added).

37.     As a result of the foregoing, defendants Oyster, Cordeiro, Alan-Lee, Rector, and Smith were aware that they had an obligation to ensure that the Company's disclosure controls were sufficient.  However, as discussed herein, the statement that the disclosure controls and procedures were effective as of May 18, 2008 was untrue.

38.     On July 7, 2008, the Company filed its definitive proxy statement on form DEF 14A with the SEC in anticipation of the annual meeting of shareholders to be held on July 28, 2008.  The proxy statement included a copy of the Company's annual report on Form 10-K for the fiscal year 2007 as filed with the SEC.  The proxy statement solicited shareholder votes on the election of directors to the Company's board, and the ratification of the selection of the Company's independent registered public accounting firm.  The Company's director nominees were defendants Smith, Oyster, Cordeiro, Alan-Lee, and Rector, as well as Gozia and Stolz. The proxy statement disclosed that defendants Cordeiro and Alan-Lee were the sole members of the Audit Committee.  As of the date of filing, the proxy disclosed that defendant Smith beneficially owned 67.2% of the Company's outstanding common stock, and that defendant Alan-Lee had granted defendant Smith a proxy to vote his 320,000 shares, or 3.3% of the Company's outstanding common stock.  Finally, the proxy statement disclosed the existence of the previously referenced Corporate Governance Agreement using substantially similar language to do so.

39.     The contents of the 2008 definitive proxy statement were materially false and

misleading because it contained the Company's 2007 Form 10-K, which the Company later admitted could not be relied on and would need to be restated.

40.     On August 14, 2008 and November 13, 2008, the Company filed its Forms 10-Q with the SEC for the second and third quarters of 2008, respectively.   The two 10-Q's were signed by defendants Smith, Oyster, and Benson and accompanied by certifications pursuant to SOX separately executed by defendants Smith and Benson.   The 10-Q's expressly incorporated the risk factor disclosures included in the March 31, 2007 Form 10-K.

41.     On March 31, 2009, the Company filed its annual report for 2008 on Form 10-K with the SEC.   Among other things the Form 10-K was signed by defendants Smith, Oyster, Benson, Cordeiro, Alan-Lee, and Rector, as well as Stoltz, and accompanied by certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") separately executed by defendants Smith and Benson.   The 10-K disclosed the following about the Company's controls and procedures:

**ITEM 9A. CONTROLS AND PROCEDURES.**

**Disclosure Controls and procedures**

An evaluation was performed under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) as of the end of the period covered by this annual report.   Our disclosure controls and procedures are designed to ensure that information required to be disclosed by us in the reports we file or submit under the Securities Exchange Act of 1934, as amended, is (1) recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and (2) accumulated and communicated to our management, including our Chief Executive Officer, to allow timely decisions regarding required disclosure. *Based on that evaluation, our management, including our Chief Executive Officer and our Chief Financial Officer, concluded that our disclosure controls and procedures were effective*.

**Management's Report on Internal Control Over Financial Reporting**

*Management is responsible for establishing and maintaining adequate internal*

13

***control over financial reporting as such term is defined in Exchange Act Rule 13a-15(f)***. The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

Under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2008 using the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control — Integrated Framework. Based on this assessment, management has concluded that, as of December 31, 2008, the Company's internal control over financial reporting was effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance  generally accepted accounting principles based on such criteria.

This Annual Report on Form 10-K does not include an attestation report of the Company's registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to attestation by the Company's registered public accounting firm pursuant to temporary rules of the Securities and Exchange Commission that permit the Company to provide only management's report in this Annual Report on Form 10-K

Our management, including our Chief Executive Officer and Chief Financial Officer, does not expect that our disclosure controls or internal controls over financial reporting will prevent all errors or all instances of fraud. A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control system's objectives will be met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within our company have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty, and that breakdowns can occur because of simple error or mistake. Controls can also be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the controls. The design of any system of controls is based in part upon certain assumptions about the likelihood of future events, and any design may not succeed in achieving its stated goals under all potential future conditions. Over time, controls may become inadequate because of changes in conditions or deterioration in the degree of compliance with policies or procedures. Because of the inherent limitation of a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

March 31, 2009 Form 10-K at 21 (Emphasis added).

42.     As a result of the foregoing, the defendants Oyster, Cordeiro, Alan-Lee, Rector, and Smith were aware that they were obligated to ensure that DGSE had adequate controls over accounting and financial reporting.

43.     On May 14, 2009, August 14, 2009, and November 16, 2009, the Company filed its Forms 10-Q with the SEC for the first, second, and third quarters of 2009, respectively.  The two 10-Q's were signed by defendants Smith, Oyster, and Benson and accompanied by certifications pursuant to SOX separately executed by defendants Smith and Benson.

44.     On September 29, 2009, the SEC filed a comment letter addressed to defendant Smith requesting revisions to DGSE's 2008 Form 10-K and second quarter 2009 Form 10-Q. Among other things, with respect to the 2008 10-K, the SEC letter stated:

> Item 9A. Controls and Procedures, page 21
> Changes in Internal Control Over Financial Reporting, page 22

> 6.     Please revise to disclose any change in internal control over financial reporting that occurred during the last fiscal quarter that has materially affected, or is reasonably likely to materially affect, your internal control over financial reporting. Refer to Item 308T of Regulation S-K.

September 29, 2009 SEC Comment Letter at 3.

45.     On October 10, 2009, the Company filed correspondence in response to the foregoing SEC comment letter.  Among other things, the Company's response purported to clarify DGSE's critical accounting policies and estimates with respect to the treatment of inventories.  In addition, the Company responded to the SEC comment related to the Internal Controls disclosures in the 2008 10-K as follows:

> **6.     The following disclosure replaces the existing disclosure in this section:**

> For the year ended December 31, 2008, we made a number of changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934) that have materially affected, or are reasonably likely to

materially affect, our internal control over financial reporting.  These changes were made in response to our assessment of internal control over financial reporting for the year ended December 31, 2007.  ***At that time and in conjunction with our auditors, management identified five material weaknesses in our internal control over financial reporting***.

***We identified two material weaknesses in our internal controls over cash***. The Controller performed the bank reconciliation. There was no review of the bank reconciliation to ensure that cash per the bank statement agreed to the general ledger and that there were no long-term outstanding reconciling items.  The CFO now reviews and approves the bank statements and reconciliations to remediate the control weakness. The second material weakness in the cash area related to internal controls around wire transfers. ***The CFO initiated and released most wire transfers without prior written or documented approval***.  The CEO, CFO, President or a Vice-President is now required to approve all wire transfers.

***We also identified a material weakness in accounts payable***. The quarterly accrual was not reviewed for accuracy nor was there a documented approval of the accounts payable accrual.   There was a risk that liabilities may have been understated for the period reported.  Management has taken corrective action to include a review of accrued liabilities by someone other than the person performing the accrual.

***We also identified a material weakness in the approval process around changes made to the general ledger structure***.  During the reporting period there had been incomplete and undocumented supervisory review of changes and additions made to the general ledger accounts. Additionally, a material weakness was detected in the closing process. The review and approval of the major balance sheet account reconciliations were undocumented during the closing process. Management has taken corrective action to improve review procedures for changes made to the general ledger account structure, reconciliations and closing procedures. Management has also documented supervisory review and approval of these general ledger account changes, account reconciliations and closing procedures.

October 10, 2009 Letter at 9-10 (Emphasis added).

46.     Due to the foregoing, defendants Oyster, Cordeiro, Alan-Lee, Rector, and Smith were aware that DGSE's internal controls were insufficient and were materially weak.  As a result, defendants were on notice that those controls required increased oversight.

47.     On November 16, 2009, the Company filed its Form 10-Q with the SEC for the third quarter of 2009.  The 10-Q wase signed by defendants Smith, Oyster, and Benson and accompanied by certifications pursuant to SOX separately executed by defendants Smith and

Benson.

48.     On January 29, 2010 the Company filed an amended Form 10-K for the 2008 fiscal year.  The 10-K was signed by defendants Smith, Oyster, Benson, Cordeiro, Alan-Lee, and Rector, as well as by Stolz, and accompanied by SOX certifications signed by Benson and Smith. In addition, the 10-K incorporated by reference portions of DGSE's definitive proxy statement relating to the 2009 Annual Meeting of shareholders.  Among other things, the amended Form 10-K disclosed:

### ITEM 9A. CONTROLS AND PROCEDURES.
**Disclosure Controls and procedures**

An evaluation was performed under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) as of the end of the period covered by this annual report.  Our disclosure controls and procedures are designed to ensure that information required to be disclosed by us in the reports we file or submit under the Securities Exchange Act of 1934, as amended, is (1) recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and (2) accumulated and communicated to our management, including our Chief Executive Officer, to allow timely decisions regarding required disclosure. *Based on that evaluation, our management, including our Chief Executive Officer and our Chief Financial Officer, concluded that our disclosure controls and procedures were effective*.

No changes in internal controls over financial reporting occurred during the last fiscal quarter that has materially affected, or is reasonably likely to materially affect, our control over financial reporting.

**Management's Report on Internal Control Over Financial Reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting as such term is defined in Exchange Act Rule 13a-15(f). The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

Under the supervision and with the participation of our Chief Executive Officer

and Chief Financial Officer, management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2008 using the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control — Integrated Framework. Based on this assessment, management has concluded that, as of December 31, 2008, the Company's internal control over financial reporting was effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles based on such criteria.

This Annual Report on Form 10-K does not include an attestation report of the Company's registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to attestation by the Company's registered public accounting firm pursuant to temporary rules of the Securities and Exchange Commission that permit the Company to provide only management's report in this Annual Report on Form 10-K

Our management, including our Chief Executive Officer and Chief Financial Officer, does not expect that our disclosure controls or internal controls over financial reporting will prevent all errors or all instances of fraud. A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control system's objectives will be met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within our company have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty, and that breakdowns can occur because of simple error or mistake. Controls can also be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the controls. The design of any system of controls is based in part upon certain assumptions about the likelihood of future events, and any design may not succeed in achieving its stated goals under all potential future conditions. Over time, controls may become inadequate because of changes in conditions or deterioration in the degree of compliance with policies or procedures. Because of the inherent limitation of a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

**Changes in Internal Control over Financial Reporting**

For the year ended December 31, 2008, we made a number of changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934) that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.  These changes were made in response to our assessment of internal control over financial reporting for the year ended December 31, 2007.  At that time and in

conjunction with our auditors, management identified five material weaknesses in our internal control over financial reporting.

***We identified two material weaknesses in our internal controls over cash***. The Controller performed the bank reconciliation. There was no review of the bank reconciliation to ensure that cash per the bank statement agreed to the general ledger and that there were no long-term outstanding reconciling items.  The CFO now reviews and approves the bank statements and reconciliations to remediate the control weakness. ***The second material weakness in the cash area related to internal controls around wire transfers. The CFO initiated and released most wire transfers without prior written or documented approval***.  The CEO, CFO, President or a Vice-President is now required to approve all wire transfers.

***We also identified a material weakness in accounts payable***. The quarterly accrual was not reviewed for accuracy nor was there a documented approval of the accounts payable accrual.   There was a risk that liabilities may have been understated for the period reported. Management has taken corrective action to include a review of accrued liabilities by someone other than the person performing the accrual.

***We also identified a material weakness in the approval process around changes made to the general ledger structure***.  During the reporting period there had been incomplete and undocumented supervisory review of changes and additions made to the general ledger accounts. Additionally, a material weakness was detected in the closing process. The review and approval of the major balance sheet account reconciliations were undocumented during the closing process. Management has taken corrective action to improve review procedures for changes made to the general ledger account structure, reconciliations and closing procedures. Management has also documented supervisory review and approval of these general ledger account changes, account reconciliations and closing procedures.

During the last fiscal quarter of 2008, there have been no changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934) that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

March 31, 2010 10-K at 26-27 (Emphasis added).

49.     Also in January 29, 2010, the Company filed an amended Form 10-Q with the SEC for the third quarter of 2009 to provide certain required SOX certifications.

50.     On February 2, 2010, the Company filed a *second* amended 10-K for the 2008 fiscal year, *only four days after* filing the first amended 10-K for that period.  The second

amended 10-K made changes to, among other things, correct the prepaid federal income tax reflected for 2008 on the Company's consolidated balance sheet.  The second amended 10-K was signed by defendants Smith, Oyster, Benson, Cordeiro, Alan-Lee, and Rector, as well as by Stolz, and accompanied by SOX certifications signed by Benson and Smith.

51.     Also on February 2, 2010, the Company filed a *second* amended Form 10-Q with the SEC for the third quarter of 2009, correcting deficiencies with the version *filed a mere four days* earlier to more accurately describe the nature of the added SOX certifications.

52.     On February 16, 2010, the Company filed amended Forms 10-Q with the SEC for the first and second quarters of 2009 correcting similar deficiencies.

53.     On February 19, 2010, the SEC filed a comment letter requesting that DGSE further amend the second amended 10-K for 2008, filed February 2, 2010, and the amended Forms 10-Q for the first and second quarters of 2009, filed February 16, 2010.

54.     On March 19, 2010, the company filed second amended Forms 10-Q for the first and second quarters of 2009, this time reflecting correct dates on signature pages.

55.     On March 22, 2010, the Company filed its *third* amended Form 10-K for the 2008 fiscal year to show appropriate dates and to correct the prepaid federal income tax reflected for 2008 on the Company's consolidated balance sheets.

56.     As a result of the multiple foregoing amendments to the Company's previously filed Forms 10-K and 10-Q during the first quarter of 2010, defendants Oyster, Cordeiro, Alan-Lee, Rector, and Smith were on actual notice that the Company's controls over accounting and financial disclosure were not sufficient.  The Individual Defendants were likewise on notice that the Company's financial reports were not poorly drafted and failed to comply with SEC rules, and that as a result, controls over financial reporting were not sufficient.

57.     On March 31, 2010, the Company filed its annual report for 2009 on Form 10-K with the SEC.  The Form 10-K was signed by defendants Smith, Oyster, Benson, Cordeiro, Alan-Lee, and Rector, and accompanied by certifications pursuant to SOX separately executed by defendants Smith and Benson.  Among other things, the 10-K incorporated by reference certain portions of the Company's definitive proxy statement relating to the 2010 Annual Meeting of stockholders and disclosed the following:

**RISK FACTORS**

* * *

**A failure of our internal controls and disclosure controls and procedures in accordance with the requirements of section 404 of the Sarbanes-Oxley Act could have a material adverse impact on us and our investors' confidence in our reported financial information.**

*Effective internal controls and disclosure controls and processes are necessary for us to provide reliable financial reports and to detect and prevent fraud.* Under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2008 using the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control — Integrated Framework. *Based on this assessment, management has concluded that, as of December 31, 2009, the Company's internal control over financial reporting was effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles based on such criteria.*

Our management, including our Chief Executive Officer and Chief Financial Officer, does not expect that our disclosure controls or internal controls over financial reporting will prevent all errors or all instances of fraud. A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control system's objectives will be met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within our company have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty, and that breakdowns can occur because of simple error or mistake. Controls can also be

21

circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the controls. The design of any system of controls is based in part upon certain assumptions about the likelihood of future events, and any design may not succeed in achieving its stated goals under all potential future conditions. Over time, controls may become inadequate because of changes in conditions or deterioration in the degree of compliance with policies or procedures. Because of the inherent limitation of a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

This Annual Report on Form 10-K does not include an attestation report of the Company's registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to attestation by the Company's registered public accounting firm pursuant to temporary rules of the Securities and Exchange Commission that permit the Company to provide only management's report in this Annual Report on Form 10-K.

If there is a failure in any of our controls as required by Section 404 of the Sarbanes-Oxley Act that leads to a material misstatement of our financial condition, investors could lose confidence in our reported financial information.

* * *

**ITEM 9A. CONTROLS AND PROCEDURES.**

**Disclosure Controls and procedures**

An evaluation was performed under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934) as of the end of the period covered by this annual report. Our disclosure controls and procedures are designed to ensure that information required to be disclosed by us in the reports we file or submit under the Securities Exchange Act of 1934, as amended, is (1) recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and (2) accumulated and communicated to our management, including our Chief Executive Officer, to allow timely decisions regarding required disclosure. ***Based on that evaluation, our management, including our Chief Executive Officer and our Chief Financial Officer, concluded that our disclosure controls and procedures were effective***.

No changes in internal controls over financial reporting occurred during the last fiscal quarter that has materially affected, or is reasonably likely to materially affect, our control over financial reporting.

**Management's Report on Internal Control Over Financial Reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting as such term is defined in Exchange Act Rule 13a-15(f). The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

Under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2009 using the criteria set forth by the Committee of Sponsoring Organizations of the Tread way Commission in Internal Control — Integrated Framework. ***Based on this assessment, management has concluded that, as of December 31, 2009, the Company's internal control over financial reporting was effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles based on such criteria***.

This Annual Report on Form 10-K does not include an attestation report of the Company's registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to attestation by the Company's registered public accounting firm pursuant to temporary rules of the Securities and Exchange Commission that permit the Company to provide only management's report in this Annual Report on Form 10-K

Our management, including our Chief Executive Officer and Chief Financial Officer, does not expect that our disclosure controls or internal controls over financial reporting will prevent all errors or all instances of fraud. A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control system's objectives will be met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within our company have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty, and that breakdowns occur because of simple error or mistake. Controls can also be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the controls. The design of any system of controls is based in part upon certain assumptions about the likelihood of future events, and any design may not succeed in achieving its stated goals under all potential future conditions. Over time, controls may become inadequate because of changes in conditions or deterioration in the degree of compliance with policies or procedures. Because of the inherent limitation of a cost-effective control

system, misstatements due to error or fraud may occur and not be detected.

March 31, 2010 Form 10-K at 9, 27-28 (Emphasis added).

58.     On April 9, 2010, the Company filed its definitive proxy statement on form DEF 14A with the SEC in anticipation of the annual meeting of shareholders to be held on April 30, 2010.  The proxy statement included a copy of the Company's annual report on Form 10-K for the fiscal year 2009 as filed with the SEC.  The proxy statement solicited shareholder votes on the election of directors to the Company's board, and the ratification of the selection of the Company's independent registered public accounting firm.  The Company's director nominees were defendants Smith, Oyster, Cordeiro, Alan-Lee, and Rector.   The proxy statement disclosed that defendants Cordeiro and Alan-Lee were the sole members of the Audit Committee.  As of the date of filing, the proxy disclosed that defendant Smith beneficially owned 65.4% of the Company's outstanding common stock, and that defendant Alan-Lee had granted defendant Smith a proxy to vote his 320,000 shares, or 3.2% of the Company's outstanding common stock. Finally, the proxy statement disclosed the existence of the previously referenced Corporate Governance Agreement using substantially similar language as the previously excerpted proxy statement to do so.

59.     The contents of the 2010 definitive proxy statement were materially false and misleading because it contained the Company's 2009 Form 10-K, which the Company later admitted could not be relied on and would need to be restated

60.     On May 17, 2010, August 16, 2010, and November 15, 2010, the Company filed its Forms 10-Q with the SEC for the first, second, and third quarters of 2010, respectively.  The 10-Q's were signed by defendants Smith, Oyster, and Benson and accompanied by certifications pursuant to SOX separately executed by defendants Smith and Benson.  The 10-Q expressly

incorporated the risk factor disclosures included in the March 31, 2010 Form 10-K.

61.     On March 31, 2011, the Company filed a Form NT 10-K with the SEC notifying of its inability to timely file its Form 10-K for the 2010 fiscal year.   The reason given for the inability to timely file was:

> Although the management of DGSE Companies, Inc., a Nevada corporation (the "Registrant"), has been working diligently to complete all the required information for its Annual Report on Form 10-K (the "Form 10-K") for the fiscal year ended December 31, 2010, and a substantial part of such information has been completed as of this date, the Registrant needs additional time to compile certain information required to be included in the Form 10-K, and the Registrant's management does not believe the Form 10-K can be completed by the March 31, 2011 prescribed due date without unreasonable effort and expense.

62.     On April 15, 2011, the Company filed its annual report for 2010 on Form 10-K with the SEC.   The Form 10-K was signed by defendants Smith, Oyster, Benson, Cordeiro, Alan-Lee, and Rector, and accompanied by certifications pursuant to the SOX separately executed by defendants Smith and Benson.   Among other things, the 10-K incorporated by reference certain portions of the Company's definitive proxy statement relating to the 2011 Annual Meeting of stockholders.   The Form 10-K acknowledged that DGSE would need to restate its financial statements for the second and third quarters of 2010 due to inaccurate inventory, accounts payable, and tax benefit disclosures:

**RISK FACTORS**

* * *

***We are subject to new corporate governance and internal control reporting requirements, and our costs related to compliance with, or our failure to comply with existing and future requirements could adversely affect our business.***

We may incur significant legal, accounting and other expenses as a result of our required compliance with certain regulations. More specifically, the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"), as well as rules subsequently implemented by the SEC, impose various requirements on public companies. Our management and other personnel must devote a substantial amount of time to

these compliance requirements. Moreover, these rules and regulations have increased our legal and financial compliance costs and make some activities more time-consuming and costly.

The Sarbanes-Oxley Act requires, among other things, that we maintain effective internal controls for financial reporting and disclosure controls and procedures. In particular, beginning with our year ended December 31, 2007, management was required to perform system and process evaluation and testing of the effectiveness of our internal controls over financial reporting, as required by Section 404(a) of the Sarbanes-Oxley Act. Section 404(b) of the Sarbanes-Oxley Act required companies to obtain auditor's attestation related to their assessment of the effectiveness of our internal controls over financial reporting. The compliance deadline for smaller reporting companies to comply with Section 404(b) had been extended by the SEC to annual reports covering fiscal years ended on or after June 15, 2010, or in our case for our annual report covering our year ended December 31, 2010.

On July 21, 2010, President Obama signed into law the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Wall Street Reform Act"). Section 989G of the Wall Street Reform Act expressly exempts issuers that are neither "large accelerated filers" nor "accelerated filers" (which includes smaller reporting companies) from the requirement contained in Section 404(b) of the Sarbanes Oxley Act to provide an auditor attestation of internal control over financial reporting.

Although we are no longer required to comply with Section 404(b), we remain subject to Section 404(a) (that is, management's report on our internal controls over financial reporting). Our testing may reveal deficiencies in our internal controls over financial reporting that are deemed to be material weaknesses. As a result, our compliance with Section 404(a) may require that we incur substantial accounting expense and expend significant management efforts. We do not have an internal audit group, and we may need to hire additional accounting and financial staff with appropriate public company experience and technical accounting knowledge to ensure compliance with these regulations and/or to correct such material weaknesses. If we are not able to comply with the requirements of Section 404(a), or if we identify deficiencies in our internal controls over financial reporting, the market price of our common shares could decline, and we could be subject to sanctions or investigations by the SEC or other regulatory authorities, which would require additional financial and management resources.

* * *

## ITEM 9A. CONTROLS AND PROCEDURES.

## Disclosure Controls and procedures

Under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer, we have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) and Rule 15d-15(e) of the Exchange Act) as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that, as of December 31, 2010, these disclosure controls and procedures were ineffective to ensure that all information required to be disclosed by us in the reports that we file or submit under the Exchange Act is: (i) recorded, processed, summarized and reported, within the time periods specified in the Commission's rule and forms; and (ii) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

There have been no material changes in internal control over financial reporting that occurred during the fourth fiscal quarter that have materially affected, or are reasonably likely to materially affect the Company's internal control over financial reporting.

**Management's Report on Internal Control Over Financial Reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting as such term is defined in Exchange Act Rule 13a-15(f). The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

Under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2010 using the criteria set forth by the Committee of Sponsoring Organizations of the Tread way Commission in Internal Control — Integrated Framework. A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis. *In its assessment of the effectiveness of internal control over financial reporting as of December 31, 2010, the Company determined that there were control deficiencies that constituted material weaknesses in the following area*:

• The Company did not maintain effective controls over certain account reconciliations. Specifically, account reconciliations *associated with inventory*, depository accounts and intercompany accounts lacked appropriate supporting

documentation and were not reviewed in a satisfactory manner. This material weakness contributed to the restatement of the current year's quarterly data contained in Note 19 in our financial statements included in this Annual Report on Form 10-K.

As a result of these material weaknesses, management concluded that the Company did not maintain effective internal control over financial reporting and safeguarding of assets as of December 31, 2010.

The Company's management has taken, or is in the process of taking, various actions that are intended to remediate these material weaknesses. The Company's Chief Executive Officer, Chief Financial Officer and its Controller are overseeing the implementation of these remediation efforts, including:

• *The hiring of an Inventory Control manager and related personnel*.

• A review of the Company's internal controls, policies and procedures and organization structure relating to the areas where material weaknesses were identified and report to the audit committee.

• The hiring of additional personnel and the retraining of existing personnel within its finance organization.

• *Increased oversight by the audit committee in both financial reporting and internal controls*.

This Annual Report on Form 10-K does not include an attestation report of the Company's registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to attestation by the Company's registered public accounting firm pursuant to rules of the Securities and Exchange Commission that permit the Company to provide only management's report in this Annual Report on Form 10-K.

Our management, including our Chief Executive Officer and Chief Financial Officer, does not expect that our disclosure controls or internal controls over financial reporting will prevent all errors or all instances of fraud. A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control system's objectives will be met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within our company have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty, and that breakdowns can occur because of simple error or mistake. Controls can also be circumvented by the individual acts of some persons, by collusion of two or more

people, or by management override of the controls. The design of any system of controls is based in part upon certain assumptions about the likelihood of future events, and any design may not succeed in achieving its stated goals under all potential future conditions. Over time, controls may become inadequate because of changes in conditions or deterioration in the degree of compliance with policies or procedures. Because of the inherent limitation of a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

\* \* \*

**Note 3 – Inventories**

\* \* \*

In May 2010, the Company undertook a complete accounting and financial reporting system conversion, replacing an older accounting system with a newer system that provides better reporting, functionality, and improved controls. ***Management determined the conversion requirements and the conversion process created multiple process and reporting errors in their general ledger and financial reporting modules inclusive of multiple book to physical and other inventory reconciling items, under reporting of customer deposits, and various unreconcilable errors identified when the Company performed its annual book to physical count adjustments at year end***.   The sum total of adjustments required to correct the effected account balances was $3,771,702 which was reflected as an adjustment to inventory impairment expense in the second quarter.  These adjustments are reflected net of tax effects in our second quarter results that have been restated in the quarterly comparison in Note 19 of our financial statements.   See also management's discussion of the internal control deficiency which precipitated this reporting problem.

\* \* \*

**Note 19 – Restatement of Quarters Ended June 30 and September 30**

When we completed our Form 10-K for the year ended 2010, we determined that it was necessary to restate our unaudited consolidated financial statements and other financial information at and for the quarters ended, June 30 and September 30, 2010. During the second quarter the Company adjusted customer deposits and accounts payable by approximately $1.9 million and $1.7 million, respectively, to accurately reflect the respective liabilities.  Furthermore, the Company adjusted inventory by approximately $3.7 million in order to reflect multiple book to physical and other inventory reconciling items.   The tax benefits of the aforementioned adjustments was approximately $1.8 million.  During the third quarter the company adjusted these same balances to reflect the changes in the second quarter.

April 15, 2011 10-K at 8, 21-23 (Emphasis added).

63.     As a result of the foregoing, upon filing of the April 15, 2011 Form 10-K, defendants Oyster, Cordeiro, Alan-Lee, Rector, and Smith were aware that the Company's controls over accounting, specifically relating to inventory, were materially deficient that the Audit Committee would need to exercise additional oversight.  However, no such oversight was exercised and the deficiency was not corrected.  Nor, apparently, did the Individual Defendants commence an investigation into the accounting and financial disclosure controls in previous financial statements.

64.     On May 6, 2011, the Company filed its Form 10-Q with the SEC for the first quarter of 2010.  The 10-Q was signed by defendants Smith, Oyster, and Benson and accompanied by certifications pursuant to SOX separately executed by defendants Smith and Benson.  The 10-Q expressly incorporated the risk factor disclosures included in the April 15, 2011 Form 10-K.

65.     On May 24, 2011, the Company filed its definitive proxy statement on form DEF 14A with the SEC in anticipation of the annual meeting of shareholders to be held on June 15, 2011.  The proxy statement included a copy of the Company's annual report on Form 10-K for the fiscal year 2010 as filed with the SEC.  The proxy statement solicited shareholder votes on the election of directors to the Company's board, and the ratification of the selection of the Company's independent registered public accounting firm.  The Company's director nominees were defendants Smith, Oyster, Cordeiro, Alan-Lee, and Rector.   The proxy statement disclosed that defendants Cordeiro and Alan-Lee were the sole members of the Audit Committee, and that all members of the Audit Committee were independent under the NYSE guidelines.  As of the date of filing, the proxy disclosed that defendant Smith beneficially owned 61.8% of the

Company's outstanding common stock, and that defendant Alan-Lee had granted defendant Smith a proxy to vote 310,000 shares of his total 337,000 shares, or 3.3% of the Company's outstanding common stock.   Finally, the proxy statement disclosed the existence of the previously referenced Corporate Governance Agreement.

66.     The contents of the 2011 definitive proxy statement were materially false and misleading because it contained the Company's 2010 Form 10-K, which the Company later admitted could not be relied on and would need to be restated

67.     On August 11, 2011, the Company filed its Form 10-Q with the SEC for the second quarter of 2010.   The 10-Q was signed by defendants Smith, Oyster, and Benson and accompanied by certifications pursuant to SOX separately executed by defendants Smith and Benson.   The 10-Q expressly incorporated the risk factor disclosures included in the April 15, 2011 Form 10-K.

68.     On October 31, 2011, the Company filed a Form 8-K with the SEC disclosing that defendant Smith was retiring as CEO and Chairman of the Board effective November 1, 2011. As a result, also effective November 1, 2011, defendant Oyster would become DGSE's CEO and Chairman of the Board.

69.     On November 10, 2011, the SEC filed a comment letter requesting amendments to the following DGSE SEC filings: (i) the Company's 2010 Form 10-K; (ii) the Company's second quarter 2011 Form 10-Q; and (iii) the Company's definitive proxy statement on Schedule 14A filed on May 24, 2011.   Among other things, the comment letter stated:

Note 19 – Restatement of Quarters Ended June 30 and September 30, page F-21

6.     Please tell us why you did not file a current report under Item 4.02 of Form 8-K to report the errors in your interim financial statements for the quarterly periods ended June 30, 2010 and September 30, 2010. Please also tell us the effect of the error corrections on each financial statement

line item, including amounts as originally reported and as adjusted. In addition, please tell us how you determined the portion of the adjustments related to each fiscal quarter.

* * *

Item 4. Controls and Procedures, page 17

8.      We note that your Chief Executive Officer and Chief Financial Officer concluded that your disclosure controls and procedures were ineffective as of March 31, 2011. Please revise to disclose the conclusion of your Chief Executive Officer and Chief Financial Officer regarding the effectiveness of your disclosure controls and procedures as of June 30, 2011. Refer to Item 307 of Regulation S-K.

November 10, 2011 Comment Letter at 2, 3.

70.     On November 14, 2011, the Company filed its Form 10-Q with the SEC for the third quarter of 2010.  The 10-Q was signed by defendants Oyster and Benson and accompanied by certifications pursuant to SOX separately executed by defendants Oyster and Benson.  Among other things, the 10-Q disclosed:

In May 2010, the Company undertook a complete accounting and financial reporting system conversion, replacing an older accounting system with a newer system that provides better reporting, functionality, and improved controls. Management determined the conversion requirements and the conversion process created multiple process and reporting errors in their general ledger and financial reporting modules inclusive of multiple book to physical and other inventory reconciling items, under reporting of customer deposits, and various unreconcilable errors identified when the Company performed its annual book to physical count adjustments at year end.  The sum total of adjustments required to correct the effected account balances was $3,771,702 which was reflected as an adjustment to inventory impairment expense in the second quarter of 2010.  These adjustments are reflected net of tax effects in our second quarter 2010 results.

November 14, 2011 Form 10-Q at 14.

71.     On November 22, 2011, the Company filed a Form 8-K with the SEC disclosing that defendant Benson had retired:

Effective as of November 17, 2011, Mr. John Benson retired from his position as the Chief Financial Officer of DGSE Companies, Inc. (the "Registrant").

Following his retirement, Mr. Benson will hold the position of Senior Consultant to the Interim Chief Financial Officer of the Registrant until March 31, 2012.  Mr. **Benson had no disagreements with the Registrant on any matter related to the Registrant's operations, policies or practices**.

November 14, 2011 Form 8-K (Emphasis added).

72.     On December 23, 2011, the Company filed a Form 8-K with the SEC disclosing that defendant Clem had been given the position of Chief Operating Officer of DGSE and would be serving as a member of the board.

73.     On February 17, 2012, the Company filed a Form 8-K with the SEC disclosing:

On April 15, 2011, DGSE Companies, Inc. (the "Company") filed its 2010 Annual Report on Form 10-K (the "2010 Form 10-K"), which disclosed the description and amount of certain adjustments made to restate the quarterly financial statements reflected in the Company's Quarterly Reports on Form 10-Q for the periods ending June 30, 2010 and September 30, 2010, respectively.  In the 2010 Form 10-K, the Company adjusted inventory, customer deposits and accounts payable to accurately reflect these balances as of June 30, 2010 and September 30, 2010 (collectively, the "Accounting Adjustments").

Investors should rely upon the definitive audited 2010 Financial Statements in the 2010 Form 10-K and the unaudited quarterly financial statements reflected in the Company's Quarterly Reports on Form 10-Q for the periods ending June 30, 2011 and September 30, 2011, respectively. Investors should no longer rely upon the unaudited quarterly financial statements reflected in the Company's Quarterly Reports on Form 10-Q for the period ending June 30, 2010 and September 30, 2010, respectively.

The Company converted to a new accounting system during the three month period ended June 30, 2010. The introduction of this new accounting system caused certain process and reporting errors which were discovered during the annual audit process working in conjunction with management and officers of the Company to determine the nature, amount and cause of the errors which resulted in the aforementioned Accounting Adjustments.

74.     On February 21, 2012, the SEC filed a comment letter related to the February 17, 2012 Form 8-K.  Among other things, the comment letter stated:

Item 4.02. Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review

33

1.     Please revise to provide the disclosures required by paragraphs (1) and (3) of Item 4.02(a) of Form 8-K. Specifically, please disclose:

- when you concluded that your financial statements for the quarters ended June 30, 2010 and September 30, 2010 should no longer be relied on; and

- whether the audit committee, or the board of directors in the absence of an audit committee, or authorized officer or officers, discussed the matters disclosed in the filing with your independent accountant.

February 21, 2012 Comment Letter at 1.

75.     On March 2, 2012, the Company filed an amended Form 8-K with the SEC in response to the comment letter.  The amended Form 8-K stated:

On April 15, 2011, DGSE Companies, Inc. (the "Company") filed its 2010 Annual Report on Form 10-K (the "2010 Form 10-K"), which disclosed the description and amount of certain adjustments made to restate the quarterly financial statements reflected in the Company's Quarterly Reports on Form 10-Q for the periods ending June 30, 2010 and September 30, 2010, respectively.  In the 2010 Form 10-K, the Company adjusted inventory, customer deposits and accounts payable to accurately reflect these balances as of June 30, 2010 and September 30, 2010 (collectively, the "Accounting Adjustments").

Investors should rely upon the definitive audited 2010 Financial Statements in the 2010 Form 10-K and the unaudited quarterly financial statements reflected in the Company's Quarterly Reports on Form 10-Q for the periods ending June 30, 2011 and September 30, 2011, respectively. Investors should no longer rely upon the unaudited quarterly financial statements reflected in the Company's Quarterly Reports on Form 10-Q for the period ending June 30, 2010 and September 30, 2010, respectively.

The Company converted to a new accounting system during the three month period ended June 30, 2010. The introduction of this new accounting system caused certain process and reporting errors which were discovered by the Company in late March 2011, resulting in the need for the Accounting Adjustments reflected in the 2010 Form 10-K.  Specifically, during the second quarter the Company increased customer deposits and accounts payable by approximately $1.9 million and $1.7 million, respectively, to accurately reflect the respective liabilities based on the accurate sub-ledger details and account reconciliations. Furthermore, the Company adjusted inventory by approximately $3.7 million in order to reflect certain valuation, book to physical and other reconciling adjustments. The tax benefit of the aforementioned adjustments was

approximately $1.8 million. In the 2010 Form 10-K, the Company also adjusted reported balances as of June 30, 2010 as they were reflected in the Company's Quarterly Report on Form 10-Q for the period ending September 30, 2010 to reflect the Accounting Adjustments.

76.     On April 2, 2012, the Company filed a Form NT 10-K with the SEC notifying

that for the second consecutive year, it would be unable to timely file its annual report on Form

10-K.  The reason given for the delayed filed was:

> Although the management of DGSE Companies, Inc., a Nevada corporation (the "Registrant"), has been working diligently to complete all the required information for its Annual Report on Form 10-K (the "Form 10-K") for the fiscal year ended December 31, 2011, and a substantial part of such information has been completed as of this date, the Registrant needs additional time to compile certain information required to be included in the Form 10-K, and the Registrant's management does not believe the Form 10-K can be completed by the March 30, 2012 prescribed due date without unreasonable effort and expense.

77.     On April 16, 2012 the Company filed a Form 8-K with the SEC disclosing that

the Company's financial statements for the years and quarters between the second quarter of

2007 and the third quarter of 2011 could no longer be relied on and had to be restated.  The 8-K

referenced the Company's "former Chief Financial Officer" and accused him of engaging in

improper accounting of inventory and other balance sheet accounts which caused the

restatement.  Upon information and belief, the "former Chief Financial Officer" was defendant

Benson.  The 8-K stated:

> On April 13, 2012, the Board of Directors of DGSE Companies, Inc., a Nevada corporation (the "Registrant"), determined the *existence of certain accounting irregularities beginning approximately during the second calendar quarter of 2007 and continuing in periods subsequent thereto* (the "Accounting Irregularities"), which could affect financial information reported since that time. The Registrant has engaged forensic accountants to analyze the Accounting Irregularities. *Based upon initial findings by the forensic accountants, Management of the Registrant believes that the Accounting Irregularities are the result of improper accounting of inventory and other balance sheet accounts by the former Chief Financial Officer of the Registrant, commencing during, and continuing subsequent to, the second calendar quarter of 2007*. The Accounting Irregularities were discovered as a result of internal investigation by

the Registrant, and the Registrant has discussed the matters disclosed in this Item 4.02 Periodic Report on Form 8-K with its independent auditors.

Financial statements and information reported since the inception of the Accounting Irregularities, currently believed to begin in the second calendar quarter of 2007, should not be relied upon, including, but not limited to:

> (a) the Registrant's Annual Reports on Form 10-K for the fiscal years ended December 31, 2007, December 31, 2008, December 31, 2009 and December 31, 2010, respectively;

> (b) the Registrant's Quarterly Reports on Form 10-Q for the periods ended June 30, 2007, September 30, 2007, March 31, 2008, June 30, 2008, September 30, 2008, March 31, 2009, June 30, 2009, September 30, 2009, March 31, 2010, June 30, 2010, September 30, 2010, March 31, 2011, June 30, 2011, and September 30, 2011, respectively; and

> (c) any press releases or earnings announcements relating to financial statements for the periods mentioned in (a) and (b), above.

As a result of the Accounting Irregularities, the Registrant has been unable to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2011 (the "2011 Form 10-K"). The 2011 Form 10-K will include a full and detailed explanation of the Accounting Irregularities, including any effects the Accounting Irregularities may have on previously-reported financial information. Management of the Registrant anticipates that the work of the forensic accountants will be completed and that the 2011 Form 10-K will be filed during the second calendar quarter of 2012, although the need to complete the forensic investigation and re-audit prior financial periods, if required, could further delay the filing of the 2011 Form 10-K.

78.    On April 17, 2012 NYSE AMEX halted trading in the DGSE stock.

79.    On May 10, 2012, the Company filed a Form 8-K with the SEC disclosing that:

"On May 8, 2012, DGSE Companies, Inc., a Nevada corporation, terminated the employment of

S. Scott Williamson as Executive Vice President -- Consumer Finance."

80.     On June 21, 2012, the SEC filed a comment letter related to the following DGSE

SEC filings: (i) the Company's Form 10-K for the 2010 fiscal year; (ii) the Company's Form 10-

Q for the second quarter of 2011; and (iii) the Company's Form 10-Q for the third quarter of

2011.  The letter stated in part:

In response to your correspondence dated February 15, 2012, we requested that you amend your filings. As of the date of this letter, amendments have not been filed. We expect you to file amendments by July 6, 2012.

If you do not amend your filings, we will, consistent with our obligations under the federal securities laws, decide how we will seek to resolve material outstanding comments and complete our review of your filings and your disclosure. Among other things, we may decide to release publicly, through the agency's EDGAR system, all correspondence, including this letter, relating to the review of your filing, consistent with the staff's decision to release publicly comment letters and response letters relating to disclosure filings it has reviewed.

June 21, 2012 Comment Letter

81.     On June 22, 2012, the Company filed a Form 8-K with the SEC disclosing:

On June 18, 2012, DGSE Companies, Inc., a Nevada corporation (the "Company"), received written notice that the Securities and Exchange Commission (the "SEC") initiated a private investigation into certain accounting irregularities, disclosed in the Company's Current Report on Form 8-K, dated April 16, 2012 (the "Accounting Irregularities"), to determine whether any persons or entities engaged in, or are about to engage in, any possible violations of the federal securities laws. The Accounting Irregularities were initially brought to the SEC's attention by the Company, and the Company continues to cooperate fully with the SEC staff in the investigation.

As announced by the Company on June 4, 2012, the Company was granted until at least October 31, 2012 by NYSE MKT (the "Exchange") to regain compliance with its continued listing standards. The investigation by the Company and its forensic accountants is ongoing, and management of the Company is working to resolve the issues surrounding the Accounting Irregularities. Management of the Company expects to meet the October 31, 2012 target set by the Exchange for compliance with the Exchange's continued listing standards (including meeting the applicable SEC reporting requirements) and resumption of trading in its securities.

82.     On March 7, 2012, a securities class action captioned, *Barfuss v. DGSE Companies, Inc*., No. 12-cv-3664, was filed in this Court in connection with violations of federal securities laws resulting in part from conduct described herein.

## DAMAGES TO THE COMPANY

83.     DGSE has been, and will continue to be, severely damaged and injured by the

Individual Defendants' misconduct.   As a direct and proximate result of the Individual Defendants' conduct, DGSE has been seriously harmed and will continue to be.   Such harm includes, but is not limited to:

      a.   losses related to the prolonged freeze on the trading of DGSE stock;

      b.   likely substantial loss of market capital when DGSE stock is unfrozen;

      c.   costs incurred in responding to the SEC probe;

      d.   costs incurred in compensation and benefits paid to defendants that breached their duties to the Company;

      e.   costs, expenses and losses in connection with defense of, and liabilities due to currently filed securities class actions and other related litigation, investigations and agency actions;

      f.   any fines that are a result of the Company's violations of the federal securities laws or other principles of law or regulation; and

      g.   any increased operating and debt expense.

84.    In addition, DGSE's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.   Specifically, it now appears to the investing public that the Company has engaged in systematic use of misleading financial statements over a period of approximately five years.   The financial viability of the Company and the motives of management are now in serious doubt.

85.    As a result, these actions have irreparably damaged DGSE's corporate image and goodwill.   For at least the foreseeable future, DGSE will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that DGSE's ability to raise equity capital or

debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

86.     With respect to Plaintiff's breach of fiduciary duty claims, a pre-suit demand on the DGSE Board is futile, and therefore, excused.  This is because despite knowing that the Company's accounting and financial disclosure controls had been questioned over a period of years, and knowing that a lack of controls over accounting would cause the Company substantial harm, the director defendants breached their fiduciary duties by permitting DGSE to function without such controls for at least five years.  In so doing, defendants exposed the Company to severe damage and injury.  Consequently, defendants face a substantial risk of liability for breach of good faith and loyalty, rendering them unable to fairly and objectively evaluate a pre-suit demand.  Thus, demand on the Board is futile, and therefore excused.

87.     The current Board of DGSE consists of the following five Individual Defendants: Oyster, Rector, Cordeiro, Alan-Lee, and Clem.  These defendants have failed to exercise reasonably appropriate oversight over the internal controls for accounting and financial disclosure.

88.     Defendant Oyster is primarily employed as the CEO of DGSE and has worked at the Company for over 20 years.  As such, he derives his primary source of income from his employment at the Company and his professional reputation is inextricably bound to his role at DGSE.  Nonetheless, during at least the last five years, first as a director, President and COO, later as CEO and Chairman of the Board, Oyster permitted the Company to function without effective accounting and financial controls even though he was undeniably aware of the following: (i) the Company was required to comply with SOX and SEC rules and regulations in the preparation of its public financial statements; (ii) the Company's deficient accounting and

financial controls caused the Company to restate and amend multiple quarterly and annual filings at times relevant to the allegations detailed herein; (iii) the accuracy of the Company's financial disclosures and its financial condition had been questioned by SEC multiple times during the previous years; and (iv) as a result of these facts, the Company's accounting financial disclosure controls were in need of significant oversight.  Defendant Oyster failed to take any effective action to institute functioning controls over the Company that he is charged with running.  Due to defendant Oyster's inaction in the face of obvious risks, DGSE has been seriously damaged. As result, demand on defendant Oyster is futile.

89.     Defendants Oyster, Rector, Cordeiro, and Alan-Lee have served continuously together on DGSE's board since at least 2007.  These four defendants, by their positions as directors, large shareholders, and/or officers, have profited off of the Company's improper accounting practices and continue to do so.  Moreover, these four defendants have been on notice since at least October 2009 that the Company's controls of accounting and financial reporting were deficient, and that defendant Benson, the Company's CFO, had been specifically implicated in contributing to these control deficiencies, yet all four defendants failed to take action until April of 2012, and even maintained defendant Benson on the Company's payroll as a consultant after his retirement.  As such, their interests conflict with the interests of unaffiliated minority shareholders and demand on defendants Oyster, Rector, Cordeiro, and Alan-Lee is futile.

90.     Defendants Cordeiro and Alan-Lee are members of the Audit Committee.  Among other things, the Audit Committee of the Board is responsible for oversight of the quarterly regulatory reporting process, internal compliance audits, results of external audits, and review of management's reports on cases of financial misconduct by employees, officers or directors.

Nonetheless, the Audit Committee failed to institute sufficient processes for managing the business and financial risks created by the failure to institute functioning controls over accounting. In addition, while the Company was publicly representing that defendant Alan-Lee was independent pursuant to NYSE rules, he held a stake in the Company ranging from 3-6% and had granted an insider, defendant Smith, proxy voting rights with respect to his shares. As a result, Alan-Lee was not independent, and his interests were entirely aligned with insider defendant Smith. By such actions, defendants Cordeiro and Alan-Lee breached their duties by failing to maintain independence and failing to sufficiently monitor the Company's business and financial risks. As a result of these defendants' breach of their duties, any demand upon them is futile.

91.     The director defendants have failed to take action against those who are responsible for permitting DGSE to function without effective accounting and financial disclosure controls for at least the past five years, including themselves. The director defendants have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks for the corporation for the wrongdoing complained of herein. Because four of the five current directors have served on the DGSE board together for at least the entire five year duration of the wrongdoing complained of herein, they have developed professional relationships, are friends and have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action. Thus, demand on the Board is futile and therefore excused.

92.     Director defendants' decision to deprive DGSE of legally sufficient internal controls resulted in the inability to ensure that the Company's financial controls and accounting

procedures were in compliance with applicable internal guidelines, public statements, regulations, and laws. The Company has admitted that it has material weaknesses in its financial controls and has for at least the last five years. There has been no assurance made that this problem is not more extensive than initially disclosed, and in the past, as detailed herein, the Company has underestimated the full extent of restatements. The restatements significantly undermine the integrity of the Company's definitive proxy statements for each of 2008, 2009, 2010, and 2011 due to each proxy statements' inclusion of the Company's Form 10-K for the year of filing. The wrongdoing alleged herein is not the product of a rogue employee or a group of such employees, but a systemic failure. Since at least 2009, the directors knew or should have known that: (i) the Company was required to comply with SOX and SEC rules and regulations in the preparation of its public financial statements; (ii) the Company's deficient accounting and financial controls caused the Company to restate and amend multiple quarterly and annual filings at times relevant to the allegations detailed herein; (iii) the accuracy of the Company's financial disclosures and its financial condition had been questioned by the SEC multiple times during the previous years; and (iv) as a result of these facts, the Company's accounting financial disclosure controls were in need of significant oversight. In the face of these red flags, the Board exhibited an intentional and/or reckless failure to exercise oversight of the Company's financial reporting processes and breached its duty of candor to shareholders. Thus, demand on the entire Board is futile and therefore excused.

93.     As particularized herein, to properly prosecute this lawsuit, DGSE directors would have to sue themselves and the other defendants, requiring them to expose themselves and their comrades to tens of millions of dollars in civil liability and/or sanctions. This they will not do. A majority of the defendants are exposed to potential liability for operating DGSE without

the internal controls over financial reporting that would have detected and prevented material weaknesses and inaccurate representations detailed herein. Thus, demand on the director defendants is futile, and therefore, excused.

94. The director defendants have benefitted, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the substantial financial benefit derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action. Likewise, these defendants have and will continue to receive substantial remuneration predicated upon their roles at DGSE. The acts complained of herein have resulted in substantial economic benefits to DGSE – as well as to defendants through their large and continuing compensation and stock ownership – without corresponding recognition or accounting for the correlated liability and risk that DGSE was subject to as a result of its lack of internal controls. The director defendants, through their course of conduct to date, have demonstrated their unwillingness to seek appropriate relief for the overpayment of this compensation once the risk is accounted for and the penalties and costs are reconciled into DGSE's balance sheet. Thus, demand on the director defendants is futile, and therefore, excused.

95. DGSE has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet, the director defendants have not filed any lawsuits against defendants or others who were responsible for the wrongful conduct to attempt to recover for DGSE any part of the damages the Company suffered and will suffer thereby. Thus, demand on the Board is futile, and therefore, excused.

96. Demand on the director defendants is futile because at least since 2007, when faced with repeated opportunities institute functioning financial controls at time when doing so

would have been appropriate, the Board failed to do so.  Moreover, on multiple occasions, after

being alerted be the SEC that the Company's financial statements were shoddily drafted,

incorrect, misleading, and otherwise problematic, the director defendants took no action.  The

director defendants were either aware of serious systematic problems in the Company's

accounting and financial controls or were in complete dereliction of their duties as directors in

not being aware.  Nonetheless, the director defendants have not publicly disclosed meaningful

steps to reveal the full extent and implications of the lack of financial controls and the

restatement of financial results.  Even at present, with the Company facing hundreds of millions

of dollars of potential liability in already filed securities class actions and SEC probe, the Board

has not made a satisfactory effort to conduct an exacting investigation to expose the true extent

of the problems.  For example, even after Oyster, Cordeiro, Alan-Lee, and Rector had substantial

indication that Benson was implicated in wrongdoing and/or completely inept, they permitted

him to maintain his position as CFO.  Once Benson "retired", those defendants permitted him to

stay on as a consultant to the new interim CFO, even though they had reason to know that he was

implicated in wrongdoing and/or not competent to discharge his duties satisfactorily.  As a result,

demand is excused.

97.     In light of the multitude of red flags related to accounting and financial disclosure

controls presented to the director defendants over a period of years, demand on the Board is

futile.  Since at least 2009, starting with the Company's admission that its controls were

inadequate during 2008, the director defendants were repeatedly confronted by evidence that the

Company was using improper and misleading accounting procedures.  As a result of the multiple

changes and restatements the Company was forced to make in its public filings since 2008, the

director defendants could not have been unaware that the Company was required to follow

certain accounting procedures and the substantial oversight and functioning controls were required to ensure that it did.  In light of this, the director defendants have shown a consistent and sustained unwillingness to take the discharge of their fiduciary duties seriously by instituting functioning financial controls as demonstrated by their inaction in the face of the following red flags, among others:

a.   In October 2009, the Company disclosed that it had identified material weaknesses in accounting controls that *specifically implicated* defendant Benson;

b.   The Company's financial reporting controls were so poor that in early 2010 it had to amend its 2008 Form 10-K *three times* in order to comply with SEC regulations;

c.   The Company's financial reporting controls were so poor that in early 2010 it was forced to amend its Forms 10-Q's for the first, second, and third quarters of 2009 *two times each* in order to comply with SEC regulations;

d.   The Company's controls were so deficient that it was unable to timely file its Form 10-K for two consecutive years, which delay now appears related to accounting chicanery;

e.   In April 2011, the Company determined that it would need to restate its quarterly financial statements for the second and third quarters of 2010 due to inventory and other accounting issues; and

f.   When the Company disclosed the need for the restatements in April 2011, it took multiple SEC comment letters before the Company complied with SEC regulations and properly disclosed the need for the restatement.

98.     Four of the five members of the Board signed each and every regular and amended Form 10-K since at least 2007.  As a result, these four board members could not have been unaware of the Company's multiple restatements, amendments, and accounting and financial reporting control deficiencies.  These four board members were on notice that the Company's accounting and financial reporting controls were susceptible to a wide variety of improper practices, they knew that the Company was exposed to significant risk as a result, and they failed implement sufficient controls so as to prevent the problems from recurring.  Thus, these four defendants breached their fiduciary duties by failing to sufficiently monitor an area of the Company's business that they knew was in need of oversight.  Because these Board members were previously given multiple opportunities to implement sufficient controls and to monitor and supervise the Company's accounting processes and failed to do so, demand on these board members is a futile and useless act.

99.     The DGSE Board is dominated by directors that are specifically implicated in the wrongdoing: each members is either: (a) an insider; (b) a member of the audit committee; or (c) signed the misleading and improper financial statements.  As a result, the Board is dominated by persons who are specifically implicated in the wrongdoing and therefore cannot be expected to sue themselves.

100.    DGSE's officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Petition by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, i.e., monies belonging to the stockholders of DGSE.  However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case

contain provisions that eliminate coverage for any action brought directly by DGSE against these defendants, known as, inter alia, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of DGSE, there would be no directors' and officers' insurance protection and thus, they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as the action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Individual Defendants is futile, and therefore, excused.

## COUNT I
## AGAINST THE DEFENDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

101.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

102.    Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14a-9.  Specifically, the [Proxies] violated §14(a) and Rule 14a-9 because they included the materially false and misleading financial statements.

103.    The Proxies were false and misleading when issued because they failed to disclose (among other things) that the Company's controls over accounting and financial disclosure were deficient and contained financial statements that were false and misleading.

104.    In the exercise of reasonable care, defendants should have known that the statements contained in the Proxies were materially false and misleading.

47

105.    The misrepresentations and omissions in the Proxies were material to DGSE shareholders in voting on the Proxies.  The Proxies were an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties in connection with the improper accounting and the failure to institute sufficient controls over financial reporting.

106.    The Company was damaged as a result of the defendants' material misrepresentations and omissions in the Proxies.

## COUNT II
## BREACH OF FIDUCIARY DUTY

107.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

108.    Each defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of DGSE's business and affairs, particularly with respect to issues so fundamental as proper accounting controls.

109.    Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company.  Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of DGSE.

110.    In breach of their fiduciary duties owed to DGSE, defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, and failed to properly oversee DGSE's business, rendering them personally liable to the Company for breaching their fiduciary duties.

111.    As a direct and proximate result of defendants' breaches of their fiduciary obligations, DGSE has sustained, continues to sustain, and will in the future sustain significant damages, including those mentioned in paragraph 83, above.  As a result of the misconduct

alleged herein, defendants are liable to the Company.

## COUNT III
## ABUSE OF CONTROL

112.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

113.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence DGSE, for which they are legally responsible.

114.    As a direct and proximate result of defendants' abuse of control, DGSE has sustained significant damages.

115.    As a direct and proximate result of defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, DGSE has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, defendants are liable to the Company.

116.    By reason of the foregoing, DGSE has been damaged.

## PRAYER FOR RELIEF

FOR THESE REASONS,  Plaintiff demands judgment in the Company's favor against all defendants as follows:

A.      Declaring that plaintiff may maintain this action on behalf of DGSE and that plaintiff is an adequate representative of the Company;

B.      Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to DGSE;

C.      Determining and awarding to DGSE the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

D.      Directing DGSE and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect DGSE and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

1.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.      a provision to permit the shareholders of DGSE to nominate at least three candidates for election to the Board;

3.      a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

E.      Determining and awarding to DGSE exemplary damages in an amount necessary to punish Individual Defendants and to make an example of defendants to the community according to proof at trial;

F.      Awarding DGSE restitution from defendants, and each of them;

G.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Pursuant to Fed. R.Civ.P. 38(b), Plaintiff demands a trial by jury.

Dated: September 21, 2012

s/ Roger F. Claxton

Roger F. Claxton
TX Bar No. 04329000
10,000 N. Central Expwy, Suite 725
Dallas, TX 75231
Tel:  (214) 969-9029
Fax:  (214) 953-0583
roger@claxtonlaw.com


ROBERT I. HARWOOD
MATTHEW M. HOUSTON
BENJAMIN I. SACHS-MICHAELS
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY 10022
(212) 935-7400

Attorneys for Plaintiff

## DGSE COMPANIES, INC. VERIFICATION

I, Jason Farmer, hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 9/18/2012

Jason Farmer